15823

HOLLOWAY v. G. O. COOLEY & SONS

(37 S. E. (2d), 666)

*Messrs. Wise & Whaley,* of Columbia, Counsel for Appellants

*Mr. J. Frank Eatmon,* of Kingstree, Counsel for Respondent,

April 2, 1946.

MR. ASSOCIATE JUSTICE OXNER delivered the Opinion of the Court.

This is a proceeding under the Workmen's Compensation Act. Claimant, Carl Holloway, a Negro, was injured on Apirl 19, 1944, while working at a sawmill plant located at Jamestown, South Carolina. It is undisputed that the accident arose out of and in the course of his employment. Claim for compensation was made against G. O. Cooley and Sons and their insurance carrier, Employers Mutual Liability Insurance Company, who denied liability on the ground that at the time of the accident claimant was not employed by G. O. Cooley and Sons, but was in the employ of Hill and Lanham Lumber Company. It is conceded that claimant was previously employed at this mill by G. O. Cooley and Sons, but it is contended that prior to the date of the accident Cooley and Sons sold the mill to Hill and Lanham Lumber Company who were operating it at the time claimant received his injury. The Industrial Commission held that Cooley and Sons and their insurance carrier were liable for compensation and the award in favor of the claimant was upheld by the Circuit Court. This appeal followed.

During the summer of 1943, G. O. Cooley and Sons, a partnership composed of G. O. Cooley, G. W. Cooley and C. O. Cooley, installed a sawmill and planing-mill plant at Jamestown. The timber used in the operation of the mill was

cut from lands which were leased by the South Carolina Lumber Company from the United States Forest Service. G. W. Cooley was president of the South Carolina Lumber Company and he and another owned all the stock. This corporation subsequently became involved and the Government contract referred to was acquired by G. W. Cooley personally. On August 18, 1943, Cooley and Sons entered into a contract with Wells-Oates Lumber Company by which the latter agreed to finance the operation of the mill, the money advanced to be secured by a mortgage on the property, and Cooley and Sons agreed to ship and deliver to the Wells-Oates Lumber Company all lumber manufactured at the plant. Under the terms of this contract Cooley and Sons were required to carry various forms of insurance, including workmen's compensation insurance on all of their employees. Compensation coverage was procured from appellant Employers Mutual Liability Insurance Company. The policy issued extended from June 1, 1943, to June 1, 1944, and covered the plant at Jamestown and any other operations by the insured in South Carolina. The coverage of this business under the Workmen's Compensation Act for the period beginning June 1, 1943, and ending June 1, 1944, was duly filed with the Industrial Commission.

On November 30, 1943, G. W. Cooley, in behalf of G. O Cooley and Sons, entered into a contract with F. C. Hill and J. C. Lanham to sell the sawmill and planing-mill plant at Jamestown, together with certain equipment and the lease covering the mill site, for the sum of $29,715.00, $15,-000.00 of which was paid when the contract was executed and the balance· of $14,715.00 was to be paid in monthly installments and secured by a mortgage on the property sold. Bill of sale and other instruments transferring title were to be executed and delivered contemporaneously with the execution and delivery of the notes and mortgage securing the unpaid portion of the purchase price. This contract further stipulated that upon the consummation of the above transaction, Cooley and Sons would enter into a further contract

whereby they would agree to advance to Hill and Lanham the sum of $25.00 per 1,000 board feet on all lumber placed on the mill yard at Jamestown by Hill and Lanham, these advances to be secured by a mortgage on the timber, in consideration of which Hill and Lanham would agree to sell through and deliver to Cooley and Sons the entire output of the mill and to pay a commission to Cooley and Sons "of 8% for handling the sales of the said output and a 2% cash discount on the receipts derived from the sales thereof." The additional contract was to contain a further provision to the effect that Hill and Lanham would have the right to operate under the timber-cutting contract which Cooley had with the Government and would assume all obligations and liabilities thereunder, and that Cooley and Sons would finance said timber contract and for this service would be paid 50¢ per 1,000 feet. The contract which the parties executed further provided that if Hill and Lanham neglected to comply with its terms, the initial payment of $15,000.00 would be forfeited as liquidated damages.

Claimant was employed by Cooley and Sons at the time the plant was being installed in the summer of 1943 and continued to work there until the time of his injury on April 19, 1944. From the outset he worked under the supervision of one Woodrow Vause as his foreman. Cooley and Sons operated the plant until December 6, 1943, when possession was delivered to Hill and Lanham, who then conducted the operations under the name and style of Hill and Lanham Lumber Company. The record discloses that claimant was a common laborer and knew nothing of the business affairs of the plant. C. O. Cooley was superintendent during the period when Cooley and Sons had possession. Claimant had no dealings with him and had seen him only occasionally. Vause was his "boss" and the only person from whom claimant received orders. Claimant contended that he knew nothing of the sale or transfer of the plant and since, as we view it, this is a vital issue in the case, we quote the following from claimant's testimony relating to this question:

"Q. So you didn't know anything about Mr. Cooley then. Do you know Mr. Fred Hill?

"A. Fred Hill?

"Q. Yes.

"A. I have seen him a time or two.

"Q. You have seen him. Do you know J. C. Lanham?

"A. I have seen him, too.

"Q. You have seen him, too. And didn't you—wasn't it known among you and the other employees there that Mr. Fred Hill and J. C. Lanham had bought that lumber plant?

"A. Well, I don't know. I don't know who bought it. When I went there I started to work for Mr. Cooley.

"Q. You know on the day you got hurt, Mr. Cooley—did you see him the day you got hurt, Mr. Cooley?

"A. No, sir.

"Q. Well, how do you know then you were working for Mr. Cooley?

"A. Well, I was working under his boss, Mr. Woodrow.

"Q. Mr. Woodrow, you say, had been working there ever since the plant started?

"A. Ever since the plant started.

"Q. Well, you don't know who Mr. Woodrow, the boss, was working for?

"A. No.

\*      \*      \*      \*

"Q. You don't know actually who you were working for, do you?

"A. No, sir.

"Mr. Wise: All right. That is all. I think that is correct; he doesn't know.

### Re-direct Examination

"By Mr. Eatmon:

"Q. You started to work for Mr. Cooley?

"A. Yes, sir.

"Q. And you worked under Mr. Woodrow, as boss?

"A. Yes, sir.

"Q. And nobody ever told you you were working for anybody else?

"A. No, sir."

After taking possession on December 6, 1943, Hill and Lanham conducted the same operations as formerly conducted by Cooley and Sons. The timber for the mill continued to be cut under the contract which G. W. Cooley had with the Forest Service, Cooley receiving 50¢ per 1,000 feet of timber cut. G. W. Cooley or his partnership continued to operate under the contract with Wells-Oates Lumber Company which required that workmen's compensation coverage be carried on the employees of the mill. After the change of possession Vause, claimant's foreman, continued to do the same work as before and claimant continued to work under Vause in the same capacity and at the same salary. Vause testified at one point that claimant's pay envelope had the name of Hill and Landham stamped on it and at another point that it was a plain envelope. The record does not disclose whether claimant can read or write. Vause testified that he knew that the purchasers assumed possession on December 6th and that thereafter he was paid by Hill and Lanham. C. O. Cooley lived at Jamestown during the operation by Cooley and Sons but moved shortly after the purchasers took possession. Hill then moved to Jamestown and managed the plant.

The notes and mortgage for the credit portion of the purchase price were never executed by Hill and Lanham. The balance of the purchase price was paid by Hill and Lanham on May 6, 1944, at which time a bill of sale was executed and delivered, the lease on the mill site assigned, the Government contract transferred, and the transaction finally consummated. In closing the transaction, insurance premiums on the various forms of insurance carried on the plant were prorated and adjusted and the mortgages on the property given by Cooley and Sons were paid from the proceeds of sale and satisfied. It was not until about this time that the insurance companies were notified of the sale and requested

to insert appropriate endorsements on the policies showing the transfer of ownership. The Industrial Commission received notice of cancellation of the workmen's compensation coverage on June 12, 1944, which stated that it was effective as of May 16, 1944.

The testimony is somewhat conflicting as to the manner in which the plant was operated from December 6th, the date when possession was given to the purchasers, until May 6, 1944, when the sale was finally consummated. However, it is undisputed that during this period Hill and Lanham made all purchases for the business in their own names, paid all employees, and were to share any profits or losses. (The business was actually operated at a loss). G. W. Cooley testified that the purchasers did not execute the notes and mortgages for the unpaid purchase price because they later decided to have someone else finance the operation of the mill; that he financed the mill from December 6th to February 11th, at which time he discontinued doing so because Hill and Lanham were making unsatisfactory statements as to the amount of lumber on hand; that from December 6th to April 14th he took the orders for the output of the mill which Hill and Lanham filled and upon which he received a brokerage of 8% and a 2% discount; that after April 14th Hill and Lanham sold their output direct and he no longer received any brokerage; and that when the sale was consummated, the workmen's compensation insurance was not included in the transfer of the insurance policies because Hill and Lanham stated that they did not want this coverage. He further testified as follows with reference to compensation coverage: "Q. When you refer to the cancelling out of insurance such as that you referred to—what was that you referred to, boiler and so forth—did you transfer the insurance to Hill and Lanham? A. I transferred everything but the Workmen's Compensation insurance, and that insurance from December the 6th until they paid me in full in May—I kept that insurance in force to protect my equity in the plant and in—in the lumber stocks."

J. C. Lanham testified that Cooley and Sons required his firm to continue all existing insurance coverage on the plant, including workmen's compensation, and that the premiums on the compensation coverage were included in those paid by Hill and Lanham when the final settlement was made on May 6th. Lanham further testified that the mill was operated under the supervision of Cooley and Sons until the full purchase price was paid; and that while all employees, including Vause, were paid by Hill and Lanham and while they had the power to hire and discharge employees, they had no right to discharge Woodrow Vause, claimant's foreman, as they were required "to carry Woodrow Vause because he was a sort of a lookout for Cooley, he was Cooley's lookout man, looking out for Cooley's interests." We quote the following from Lanham's testimony: "He (G. W. Cooley) said he did not want it to operate except in his name and in the beginning told us 'now, all this insurance of every kind, and everything has got to be kept up, because I am not going to run it in my name with everything changed for if we get in any trouble, I want things just like they are.' "

It is not altogether clear whether in some of the transactions referred to G. W. Cooley was acting individually or for the partnership of G. O. Cooley and Sons. He appears to have been the managing partner and to have financed the operations of G. O. Cooley and Sons. He executed the contract of sale with Hill and Lanham in his individual capacity but testified that in doing so he was acting for the partnership. However, it is undisputed that the mill was operated by the partnership, that claimant was employed by the partnership, and that the workmen's compensation coverage was in the name of the partnership.

Counsel have discussed at great length the question of whether title to the property sold was in the sellers or purchasers at the time claimant received his injury and also the character of relation between Cooley and Sons and Hill and Lanham Lumber Company between December 6th and May

6th. But the right of the claimant under the facts of this case to recover compensation against appellants does not necessarily depend upon the determination of these questions. This is not an action between the sellers and purchasers. Nor are we concerned with the rights of a third party who contracted with Hill and Lanham after they assumed possession of the plant. We may concede for the purpose of this discussion that during the period in controversy Hill and Lanham had full control of the operation of the plant.

It is undisputed that claimant was originally employed by Cooley and Sons. Did he thereafter understand that he was submitting himself to the control of a new master? He is not chargeable with the legal consequences of the arrangement between Cooley and Sons and Hill and Lanham as actually made. He is chargeable only with the legal consequences of the arrangement as known and approved. In *Murray v. Union Railway Co. of New York City,* 229 N. Y., 110, 127 N. E., 907, Justice Cardozo said: "Employment, like any other contract, presupposes understanding. The new relation cannot be thrust upon the servant without knowledge or consent. . . . Understanding may be inferred from circumstances, but understanding there must be. . . . Rights and remedies are not lost by stumbling unawares into a new contractual relation. There can be no unwitting transfer from one service to another."

The claimant in this case denied knowledge of the sale or transfer of possession to Hill and Lanham. All he knew was that he commenced working for "Mr. Cooley" and was never informed of any change. After the transfer he continued in the same capacity and at approximately the same salary. He continued to take orders from the same superior—Vause—and his superior continued in the same capacity. The business was conducted in the same general way after the transfer of possession. In this situation the authorities are clear that the original employer continues liable to the employees who have no notice of the change. *Palmer v. Main et al.,* .. Ky., .., 272 S. W., 736; *Ben-*

*son v. Lehigh Valley Coal Co.,* 124 Minn., 222, 144 N. W., 774, 50 L. R. A. (N. S.), 170; *Traders and General Insurance Co. v. Jaques et al.,* 131 S. W. (2d), 133; *Buchanan Mining Co. et al. v. Henson,* 15 S. W. (2d), 291; *Wilson & Co. Inc. v. Locke* (C. C. A., Second Circuit), 50 F. (2d), 81; *Noel v. Morrison et al.,* 22 N. Y. S. (2d), 649, 71 C. J., page 397.

There is no evidence that the claimant was expressly notified of the transfer. Vause testified that in his opinion claimant knew of the new relation but this claimant denies. Of course, understanding on the part of the servant may be inferred from circumstances. But if an understanding of a new relation may be imputed to the claimant in this case, it is at most an inference of fact to be drawn by the Industrial Commission. There are no circumstances to make this inference inevitable. Whether the circumstances were such as to necessarily put claimant on inquiry involved a question of fact to be determined by the Industrial Commission. The burden of showing that claimant had notice of the change was upon appellants. *Benson v. Lehigh Valley Coal Co., supra.* In any event, it cannot be said as a matter of law that the claimant knew of the transfer or that this is the only inference of fact to be drawn from the circumstances.

Cooley and Sons elected to come within the provisions of the Workmen's Compensation Act and a report of the coverage was filed with the Industrial Commission. Claimant was injured on April 19th. The policy was not cancelled until May 16th and notice of cancellation was given to the Industrial Commission on June 12th. Prior to this time Cooley and Sons never notified the Industrial Commission of the sale or transfer or that they desired to cancel the compensation coverage. G. W. Cooley testified that he kept this insurance in force until May. Hill and Lanham thought the coverage continued and in the final settlement paid the premium to Cooley and Sons. It is suggested that the policy in question contains a provision that no assignment of any interest under the policy shall bind the Company unless its con-

sent is endorsed thereon. But this is not a contest between the insurer and insured. Under the terms of the Act and paragraph D of the policy, a direct obligation arose from the carrier to the claimant and this obligation would not be affected by the failure of the sellers or purchasers to give notice to the carrier of a sale or a transfer of possession of the business. Before Hill and Lanham assumed possession certainly claimant was protected by workmen's compensation coverage. Did this protection cease when his employers, without his knowledge or consent, transferred possession of the business to a third party?

We think there was ample evidence to sustain the finding of fact by the Industrial Commission that both appellants were liable for the award made to claimant.

There are also certain exceptions relating to the admissibility of certain evidence. As the same result would follow even though these exceptions were sustained we deem it unnecessary to pass upon the questions relating to the admissibility of evidence.

Judgment affirmed.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES STUKES and TAYLOR concur.

MR. ASSOCIATE JUSTICE FISHBURNE did not participate.